W. L. TAYLOR, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

F. L. BATEMAN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 68067, 69689. Promulgated April 17, 1936.

*J. R. Sherrod, Esq.*, for the petitioners.
*T. M. Mather, Esq.*, for the respondent.

OPINION.

MURDOCK: The Commissioner determined the following deficiencies for the year 1929:

| Name | Docket No. | Amount |
|---|---|---|
| W. L. Taylor | 68067 | $19, 108. 50 |
| F. L. Bateman | 69689 | 10, 500. 03 |

The Commissioner, in determining these deficiencies, added to the income of each petitioner, as reported on his return, additional income representing Liberty bonds received by each petitioner in 1925 from the Transcontinental Freight Co. to guarantee payment of any income tax that might have been due from that company prior to the time that the petitioners sold their stock in that company to the Baldwin Universal Co. The Commissioner explained that he included this amount in the petitioners' income for 1929 because it was finally determined in that year that no liability for tax existed against the company. The Commissioner also made other adjustments which are not in dispute. The sole issue in these proceedings is whether the amounts in question were properly included in computing the income tax liabilities of the petitioners for 1929. The facts have been stipulated.

The petitioners and their wives owned all of the stock of the Transcontinental Freight Co. which was outstanding in May 1925. They sold all of this stock to the Baldwin Universal Co. in May 1925. The question of the profit realized by the sellers in 1925 on that sale has been settled in other proceedings by decisions pursuant to stipulations filed with the Board.

The two petitioners now before the Board entered into an agreement dated May 9, 1925, as parties of the second part, with the Transcontinental Freight Co., as party of the first part. The petitioners entered into that agreement "as one of the considerations of the sale of the stock." The agreement provided that, in consideration of United States Government bonds of the par value of $145,000 received by the petitioners from the Transcontinental Freight Co., the two petitioners agreed "to assume and pay all additional United States income and excess profits taxes ultimately found to be due from the first party to the United States of America for the years 1917 to 1924, inclusive", except for the unpaid installments of 1924 taxes shown on the original returns of the company. The petitioners further agreed to save the first party harmless and defend it without expense to itself against all claims and demands for the aforesaid taxes, and also to pay all attorneys' fees and other expenses incurred thereafter in connection with the adjustment of such additional taxes. The first party relinquished all right to receive back any part of the United States Government bonds in case the tax liability of the company might be settled for less than $145,000. The petitioners received Liberty bonds of the par value of $145,000 from the Transcontinental Freight Co. in 1925. The Transcontinental Freight Co. at that time had filed proceedings before the Board contesting the Commissioner's determination of deficiencies against it for the years 1917 to 1920. The total taxes involved amounted to $133,917.08. Those proceedings were finally settled in February 1929, by a stipulation in which the Commissioner agreed that there was no tax liability because the corporation was entitled to classification as a personal service corporation.

The petitioners filed their income tax returns on the cash receipts and disbursements basis. They did not report any part of the $145,-000 in their incomes for 1925. A revenue agent included it, the petitioners protested against its inclusion, the protest was allowed by the Commissioner, and, in the final settlement of their tax liabilities for 1925, no part of the $145,000 was included in their incomes. The gist of the protest which was agreed to by the Commissioner was that there could be no determination of income on the receipt of the Liberty bonds until it was settled whether the corporation was liable for any tax and what amount the petitioners

might have to expend to defend the corporation. The Commissioner, in determining the deficiencies for 1929, included $72,500 in the income of each petitioner and allowed as a deduction to each an item of $7,463.24, claimed as attorneys' fees in connection with the settlement of the tax liability of the Transcontinental Freight Co.

Each petitioner now contends that the $72,500 was income to him in 1925, despite the fact that he failed to include it in his income for 1925 and despite the fact that he successfully resisted its inclusion in his 1925 income on the ground that it was not income until 1929, when the tax liability of the Transcontinental Freight Co. was finally settled. Each further contends, as an alternative, that even if the amount was not income for 1925 because of the uncertainty of the litigation and the expenses incident thereto, then, for the same reason, it was not income for 1929, because a proceeding involving the petitioner's personal liability for taxes for 1925 is still pending before the Board. However, income taxes on personal income for 1925 and expenses incident thereto are not, under any theory of this case, proper deductions from the $72,500 nor from either petitioner's income for 1929. Therefore, the personal tax cases pending will not affect the present cases and the alternative contention deserves no further consideration. The Commissioner argues that his determination for 1929 must be approved by reason of an estoppel, but he fails to point out in the evidence the essential elements of an estoppel. We are of the opinion, however, that he need not invoke estoppel, nor any principle akin thereto, in order to sustain his determinations.

The record clearly indicates that the transaction whereby the stockholders of Transcontinental sold their stock in that corporation to Baldwin was separate and distinct for tax purposes from the transaction between Transcontinental and the petitioners in regard to the taxes and Liberty bonds. The question of the receipt of the $145,000 of Liberty bonds was in no way involved in the computation of the gain of the former Transcontinental stockholders from the sale of their stock. Thus the receipt of the $145,000 of Liberty bonds and the agreement on the part of the petitioners to litigate and settle the tax controversy was a separate and new transaction for income tax purposes which was entered into by the petitioners for profit in 1925. Although the petitioners received the Liberty bonds in 1925, they did not realize a gain of $145,000 in 1925 from the transaction because the transaction was only then beginning, and it was apparent at that time that they would have to make some expenditures which might even exhaust the entire amount which they had received. Until the tax liability was settled and their expenses determined, no one could say whether they had had a gain or a loss. The transaction was incomplete for tax purposes

until 1929, when the tax liability which they had agreed to settle was finally settled and their expenses of litigation paid. Then for the first time their gain on the transaction could be computed by deducting their expenditures from their receipts. This the Commissioner did by including $72,500 in income for 1929 and deducting therefrom the expenses of litigation. The difference was the profit which the petitioners realized, and the Commissioner did not err in including this profit in income for 1929.

The transactions in the cases cited by the parties were not like the transaction in this case. For example, the petitioners have cited a number of cases where paving contractors received the contract price upon completion of the contracts and were required to report their profits on the contract at that time although they were still obligated to make any repairs to the paving which might become necessary during a fixed period thereafter, with or without reserve for the purpose. Cf. *Mead Construction Co.*, 3 B. T. A. 438, and cases there cited. The Board and the courts in those cases held that where the contractor received the contract price, he could not eliminate any part of it in computing his gain on the contract. See, however, *Commissioner* v. *Cleveland Trinidad Paving Co.*, 62 Fed. (2d) 85. The difference is that in the present case the $145,000 was not received as a part of the contract price upon a completed contract. It was entirely separate from the amount received for the stock, was received from a different party, was not involved in the computation of the profit from the sale of the stock, and formed compensation which the petitioners were to receive for a wholly new undertaking for a different party which involved the expenditure by them of an amount then uncertain. In other words, the fact, here present, that the petitioners' undertaking for which they received the $145,000 was separable for tax purposes from the transaction in which they sold their stock, serves to distinguish this case from the paving cases. It is likewise true that the present case is distinguishable from other cases cited by the respondent where a certain amount was placed in escrow or held in a fund for the discharge of tax liabilities. Cf. *Stoner* v. *Commissioner*, 79 Fed. (2d) 75, reversing 29 B. T. A. 953; *Preston R. Bassett*, 33 B. T. A. 182. It is likewise distinguishable from cases where taxpayers on an accrual basis are regularly engaged in some business where they receive payments in advance and later have to make expenditures, or make expenditures and later receive payment. Cf. *Burnet* v. *Sanford & Brooks Co.*, 282 U. S. 359.

*Decision will be entered for the respondent.*